**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JoAnna Laiscell | : | |
| Plaintiff, | : | |
| | : | No. 20-cv-01463 (VLB) |
| v. | : | |
| | : | |
| Board of Education, *City of* | : | September 22, 2023 |
| *Hartford*, | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |

**MEMORANDUM OF DECISION GRANTING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 82]**

Plaintiff JoAnna Laiscell, a Black woman who worked for the City of Hartford Board of Education's finance department for 15 years, alleges her employer discriminated against her when it failed to promote her to Chief Financial Operator ("CFO") and then terminated her in retaliation for filing a discrimination complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). Before the Court is Defendant's Motion for Summary Judgment. For the following reasons, the motion is GRANTED.

I.     BACKGROUND

A.     Facts

Plaintiff JoAnna Laiscell is a Black woman who lives in Connecticut. (Dkt. 1 (Compl.) ¶¶ 1, 5; Dkt. 15 (Ans.) ¶¶ 1, 5.) Defendant City of Hartford Board of Education ("Board") is a municipal corporation responsible for operating the Hartford Public School District ("District"). (*See* Dkt. 1 ¶ 2; Dkt. 15 ¶ 2.) The District's superintendent is Leslie Torres-Rodriguez, a Hispanic female. (Dkt. 87

(Pl.'s 56(a)(2) ¶ 27.)   Ms. Laiscell worked for the Board from 2003 until her termination on July 12, 2018.  (Dkt. 1 ¶ 6; Dkt. 15 ¶ 6.)

In 2013, the Board promoted Ms. Laiscell to Executive Director of Financial Management, and she held this position until her termination.  (Dkt. 1 ¶ 6; Dkt. 15 ¶ 6.)  Ms. Laiscell's job duties included overseeing the District's finances, developing the budget, and maintaining the budget.  (Dkt. 87 ¶ 4.)

The relevant facts in this case involve two separate issues that took place during the same time period.  First, the CFO resigned in January 2018 and the Board initiated its standard hiring process to find her replacement.  Ms. Laiscell applied and the Board interviewed her, but it chose another candidate.  Second (and while the hiring process was ongoing), the Board conducted an audit of its employee health benefits plan to determine whether ineligible dependents were improperly covered.  The audit revealed there were ineligible individuals covered by the plan, including Ms. Laiscell's former husband.  It opened an independent investigation into Ms. Laiscell's conduct, placed her on leave, and ultimately terminated her.  For organizational purposes, the Court will discuss these events separately because they relate to separate claims, even though they took place simultaneously.

> 1.   *Hiring the New CFO*

In January 2018, the Board's CFO, Paula Altieri, resigned.  (Dkt. 87-22 (Pl.'s Tr. Altieri Depo.).)  Ms. Laiscell, Deputy Superintendent Dr. Alberto Vasquez-Matos, and Maureen Coleman (whose title is not in the record) assumed her duties.  (Dkt. 87-12 (Pl.'s Tr. Torres-Rodriguez Depo.) at 81:13–16.)  In relevant part, one aspect

of Ms. Laiscell's new duties was to oversee the Risk Management department, including its Executive Director, John Griffin.  (Dkt. 83-7 (Pedneault Decl. & Ex. A) at Ex. A, Laiscell-000039.) The Board paid Ms. Laiscell a "stipend or differential" for her performance of additional job duties.  (Dkt. 87-12 at 82:21–83:1.)  On January 12, 2018, the Board posted the open CFO position.  (Dkt. 1 ¶ 9; Dkt. 15 ¶ 9.)  Ms. Laiscell applied.   (Dkt. 1 ¶ 10; Dkt. 15 ¶ 10.)

To select the new CFO, the Board created a hiring panel.  (Dkt. 87 ¶ 8.)  The panel included seven interviewers, and all of them were Board administrators who held different positions in different departments.  (*Id.*)  The race and sex demographics of these seven interviewers included one Black female, Natasha Banks (Executive Director of Talent Management); one Hispanic male, Dr. Vasquez-Matos; four White females, June Sellers, Yolanda Burt, Nancy Williams, Maureen Coleman (whose titles are not listed); and one White male, Victor Cristofaro (whose title is not listed).  (*Id.* ¶ 9.)  Ms. Laiscell knew each of these interviewers in their professional capacities, including when she previously served on a hiring panel with them.  (*Id.* ¶¶ 10, 24.)

With respect to the interviews, the Board utilized its standard interview process.  (*Id.* ¶ 22.)  Each candidate was asked the same seven questions.  (Dkt. 1 ¶ 12; Dkt. 15 ¶ 12.)  For each of the seven questions, every interviewer scored the candidate's answer on a scale of one to four, giving the candidate the potential to obtain 28 points from each interviewer.  (Dkt. 1 ¶ 12; Dkt. 15 ¶ 12.)  When adding all interviewers' scores together, a candidate could obtain a total score of 196.  (*See*

Dkt. 1 ¶ 12; Dkt. 15 ¶ 12.)  Ms. Laiscell had previously been chosen for positions through this standard interview process.  (Dkt. 87 ¶ 23.)

The hiring panel interviewed seven candidates, including Ms. Laiscell.  (*Id.* ¶ 13; Dkt. 1 ¶ 10; Dkt. 15 ¶ 10.)  Out of all seven candidates, David Fleig, a White male, received the highest score of 157.5.  (Dkt. 87 ¶ 15.)  Darrell Hill, a Black male, ranked second highest with a score of 137.  (*Id.* ¶ 16.)  Ms. Laiscell received the third highest score with a score of 127.  (*Id.* ¶ 17.)

The Board submitted a declaration from Ms. Banks.  (Dkt. 83-2 (Banks Decl. & Exs.).)  She stated that it was regular practice for each interviewer to score each candidate "at the time of the interview," for the District to retain possession of the score sheets, and for the District to create a chart of all candidates' scores from each interviewer.  (*Id.* at Decl. ¶¶ 16–17.)  The record includes the score sheets for Ms. Laiscell and the chosen candidate, Mr. Fleig, as well as the chart.  (*See id.* at Exs. A (Interview Score Sheets) & B. (Chart).)  Notwithstanding the poor quality of the chart, the Court is able to discern that the documents confirm that Mr. Fleig ranked first, Mr. Hill ranked second, and Ms. Laiscell ranked third.

The hiring panel recommended that Superintendent Torres-Rodriguez interview Mr. Fleig.  (Dkt. 83-2 at Decl. ¶ 17; Dkt. 83-4 (Torres-Rodriguez Decl. & Exs.) at Decl. ¶ 8.)  In addition to the fact that he received the highest score, Mr. Fleig also had experience forecasting, which was a skillset Superintendent Torres-Rodriguez wanted her new CFO to have.  (*See* Dkt. 83-2 at Decl. ¶ 12 & Ex. A; Dkt. 83-4 at Decl. ¶ 6.)  Superintendent Torres-Rodriguez interviewed Mr. Fleig and recommended him to the Board.  (Dkt. 83-4 at Decl. ¶¶ 9–10.)  She did not review

anyone else, as it was regular practice for the hiring panel to recommend only one individual. (*Id.* ¶¶ 11–12.)  The Board hired Mr. Fleig on April 3, 2018.  (Dkt. 87 ¶ 21.)

2.    *The Audit*

On September 12, 2017, the Board's Finance Committee began discussing the possibility of auditing the dependents on the employee health benefits plan.  (*See id.* ¶¶ 30–32, 35.)  Ms. Laiscell was a member of the Finance Committee at that time and attended the meeting.  (*Id.* ¶ 35.)  Mr. Griffin proposed the audit.  (*Id.* ¶¶ 37; Dkt. 87-19 (Pl.'s Tr. Griffin Depo.) at 43:1–4.)  He circulated a memorandum to the Finance Committee that stated the following:

> There may be times throughout the year that current employees may have family status changes (i.e., marriage, divorce, birth of a child, etc.).  When these qualifying events occur, employees may add or delete dependents by providing the same legal documents new hires are required to provide.  To ensure all our 4,000 dependents currently being covered on the plan are eligible, we will be conducting a Dependent Eligibility Verification Audit to weed out ineligible dependents.  Ineligible dependents have the potential to create serious financial burdens on the district.

(Dkt. 83-6 (Griffin Decl. & Exs.) at Ex. B (9/12/17 Mem.).)  In January 2018, the Board sent an announcement to its employees, informing them that an audit would be conducted and instructing all employees to remove ineligible dependents by March 13, 2018.  (Dkt. 87 ¶ 40; Dkt. 83-6 at Ex. D (2/26/18 E-mail).)

The process to remove an individual from the employee health benefits plan required the employee to submit a form to human resources.  (Dkt. 87 ¶ 47.)  Elaine Bonfiglio, Insurance and Benefits Specialist, was in charge of this process.  (Dkt. 87-13 (Pl.'s Tr. Banks Depo.) at 22:7–17; Dkt. 87-19 at 98:20–25.)  As a brief background, Ms. Laiscell had been married but divorced her husband in December

5

2014.  (Dkt. 87 ¶ 45.)  Ms. Laiscell was aware of this protocol when she got divorced, but there is no record of her submitting the required form.  (*Id.* ¶ 48.)  Ms. Laiscell testified, however, that she submitted the paperwork to Ms. Bonfiglio who failed to complete the task.  (Dkt. 87-24 (Pl.'s Tr. Laiscell Depo.) at 126:3–20.)

The audit began on February 5, 2018.  (Dkt. 83-6 at Ex. E (3/16/18 Mem.).)  On February 22, 2018, at 4:08 pm, Mr. Griffin e-mailed Ms. Laiscell informing her that the deadline to drop dependents had been extended from March 13 to April 13.  (*Id.*)  He also outlined the projections:

> **Based on hundreds of similar audits, Secova projects 1.5% of employees will not respond to requests to provide proof of their dependents, they also project a dependent drop rate of 8%....Also, an estimated total of 320 dependents may be removed from the plan as a result of this audit.  Thus far, ten dependents have been dropped voluntarily and we project this number to increase during the upcoming weeks.  As noted in earlier communication, we found one ineligible dependent with claims totaling over $360,000.  At the end of this project, we will save in excess of $1M.**

(*Id.*)  Ms. Laiscell responded that she sent the e-mail to Superintendent Torres-Rodriguez and Deputy Superintendent Vasquez-Matos.  She added: "I excluded ['] Also, an estimated total of 320 dependents may be removed from the plan as a result of this audit.[ '] I hope that's not concerning to you." (*Id.*)  The record does not provide any context as to why Mr. Griffin sent the original e-mail to Ms. Laiscell nor as to why Ms. Laiscell forwarded his e-mail to the District leaders.  The next Monday, on February 25, Mr. Griffin responded to Ms. Laiscell's e-mail, stating that her alteration of his e-mail violated the "standard of conduct."  (*Id.*)

On March 12, 2018, Ms. Laiscell timely removed her ex-husband from her employee health benefits plan.  (*Id.* ¶¶ 48–49.)  Four days later, Mr. Griffin drafted a letter to Superintendent Torres-Rodriguez and Deputy Superintendent Vasquez-

Matos, expressing concern that Ms. Laiscell likely engaged in unethical and potentially fraudulent behavior.  (Dkt. 83-2 at Ex. C (3/16/18 Mem.).)  In summary, he stated that Ms. Laiscell a) improperly left her ex-husband on her employee health benefits plan for several years; b) expressed frustration and "considerable hostility towards" him about the audit, including recommending that the audit be scrapped; c) altered an e-mail drafted by him and—after removing key information about the audit's purpose—forwarded it to the Superintendent and Deputy Superintendent; and d) criticized his performance on several projects.  (*See id.*)

The same day, the Board placed Ms. Laiscell on paid administrative leave. (Dkt. 87 ¶ 59.)  (Ms. Laiscell's placement on paid administrative leave occurred ten days after her interview for the CFO position.  (Dkt. 1 ¶ 10; Dkt. 16 ¶ 10.))  The Board then hired an independent forensic accounting firm, Forensic Accounting Services, LLC ("FAS"), to investigate Ms. Laiscell.  (Dkt. 87 ¶ 60; Dkt. 83-7 at Decl. ¶ 5.)  In March, FAS received documents from the Board's counsel and several Board representatives, including Mr. Griffin.  (Dkt. 87 ¶ 60.)  FAS then interviewed Ms. Laiscell on April 12, 2018 with Deputy Superintendent Vasquez-Matos, Budget Manager Mark Williams, and Assistant Superintendent for Talent Management Peter Dart present.  (*Id.* ¶ 61.)  The Board had offered Mr. Fleig the CFO position nine days prior.  (Dkt. 87 ¶ 21.)

On April 30, 2018, Ms. Laiscell filed a discrimination complaint with the CHRO, which she later amended after she was terminated.  (Dkt. 87 ¶ 66.)  She alleged that the Board discriminated against her on the basis of her race, color and sex when it placed her on paid administrative leave.  (Dkt. 87-3 (Pl.'s Ex. B, CHRO

7

Filings) at Aff. ¶¶ 6, 23–35.)  She also alleged the Board placed her on administrative leave to prevent her from obtaining the CFO position.[1]  (*Id.*)

FAS issued a report on May 31, 2018.  (*Id.* ¶ 14.)  According to the declaration submitted by Stephen Pedneault, FAS' principal, the firm made several findings. First, it determined Ms. Laiscell's ex-husband was ineligible for coverage, but he had remained on the plan and incurred approximately $6,691 in claims.  (Dkt. 83-7 at Decl. ¶ 11.)  Second, it determined Ms. Laiscell had stored budget information locally instead of on the District's shared database, including budget files for which only she was responsible.  (*Id.* ¶ 10.)  Third, Ms. Laiscell was uncooperative during her interview on April 12, 2018, because she refused to give information or answer questions.  (*Id.* ¶¶ 8–9.)

On June 1 and 14, 2018, the Board met with Ms. Laiscell about her employment.  (Dkt. 87 ¶ 67.)  The Board ultimately terminated Ms. Laiscell in a letter from Superintendent Torres-Rodriguez dated July 12, 2018.  (*Id.* ¶ 68.)  The letter summarized the June interviews as well as FAS' findings, and it documented the fact Ms. Laiscell kept her husband on her employee health benefits plan, failed to save her budget files on the shared drive, used her position to minimize the importance of the audit, and re-published an edited version of Mr. Griffin's e-mail without his consent.  (Dkt. 83-4 at Ex. A (7/12/18 Ltr.).)   In the letter, Superintendent Torres-Rodriguez concluded Ms. Laiscell's conduct was "unacceptable and wholly unprofessional, stating: "Such conduct is particularly egregious given your stature

---

[1] Once Ms. Laiscell was terminated, she filed another CHRO complaint alleging her termination constituted discrimination on the basis of her race, color and sex and retaliation for filing her initial CHRO complaint. (*See id.*)

and position held in the District as the Executive Director of Financial Management. In that role, you received and were aware of very specific information related to the dependent audit and used your position to minimize the importance of the audit." (*Id.*)

Mr. Griffin testified that the audit was not intended to be punitive.  (Dkt. 87-19 at 100:12–20.)  Rather, the Board assessed whether an employee's failure to remove an individual appeared to be intentional.  (*Id.* at 101:11–24.)  Superintendent Torres-Rodriguez testified that she received the audit results, which identified several employees with ineligible dependents.  (Dkt. 87-16 (Pl.'s Tr. Torres-Rodriguez Depo.) at 31:10–16.)  Mr. Dart testified that approximately 20 to 30 employees had ineligible dependents and that he was not aware of any employees other than Ms. Laiscell who were placed on administrative leave or investigated. (Dkt. 87-25 (Pl.'s Tr. Dart Depo.) at 78:2–23.)

It is undisputed that the only other employees who included ineligible employees on their healthcare plans held positions at a lower level than Ms. Laiscell and were also union members.  (*See* Dkt. 87 ¶ 72.)  For example, Patricia Wakefield, a Black tenured teacher, improperly included her ex-husband who incurred several hundreds of thousands of dollars.  (*Id.* ¶ 73.)  According to Superintendent Torres-Rodriguez and Ms. Banks, Ms. Wakefield informed the Board of this issue before the audit began.  (Dkt. 83-2 at Decl. ¶ 36; Dkt. 83-4 at Decl. ¶ 25.)  The Board followed the state law's due process requirements afforded to tenured teachers facing termination.  (Dkt. 87 ¶ 75.)  Before the Board could terminate Ms. Wakefield, she resigned.  (*Id.* ¶ 76.)  There is nothing in the record to

show that the Board relied on any of these lower-level employees to assure the integrity of its financial affairs.  Furthermore, the record does not identify any other employees who caused the Board financial loss as a result of an ineligible dependent.

### B. Evidence of John Griffin's Animus

Ms. Laiscell submitted an affidavit from Bridgette Lee who has worked as the Senior Risk Management and Wellness Coordinator since August 2017.  (Dkt. 89-2 (Lee Decl.) ¶ 2.)  Mr. Griffin was her direct supervisor, and Ms. Lee worked on the audit as his "right-hand person."  (*Id.* ¶¶ 3–4.)  According to her declaration, Mr. Griffin referred to Ms. Laiscell as a "black bitch" and stated, "he had a plan to get rid of her."  (*Id.* ¶ 7.)  Ms. Lee only observed Ms. Laiscell interact with Mr. Griffin once.  (*Id.* ¶ 22.)  She believes that Mr. Griffin's memorandum from March 2018—in which he complained about Ms. Laiscell harassing and bullying him—was fabricated to lead to Ms. Laiscell's termination.  (*Id.* ¶ 22.)  Ms. Lee also stated it was "well known throughout the department that Griffin had racist and sexist attitudes and beliefs, and that he acted these beliefs out at work."  (*Id.* ¶ 23.)

Ms. Lee stated that Griffin used his supervisory powers to require her to research information he could use against Ms. Laiscell.  (*Id.* ¶ 17.)  Mr. Griffin screamed at Ms. Lee, forced her to work extra hours and on weekends, and harassed her, which caused her to file two verbal complaints with Human Resources and Ms. Banks.  (*Id.* ¶¶ 11, 19.)  In response to one of the complaints, Ms. Banks stated, "I told him not to do this again."  (*Id.* ¶ 14.)  Ms. Banks also told Ms. Lee to "let it go" because Griffin had "dementia."  (*Id.* ¶ 27.)

Ms. Lee declared, "Once the plaintiff was terminated, Griffin had no more interest in the audit."  (*Id.* ¶ 21.)  However, Mr. Griffin testified that he resigned in April or May 2018, (Dkt. 87-19 at 12:3–12), i.e., around the time Ms. Laiscell was placed on leave but at least two months before she was terminated, (Dkt. 87 ¶ 68).

### C.   Procedural History

Ms. Laiscell initiated this action on September 26, 2020.  After defense counsel entered their appearances and the parties jointly filed their Rule 26(f) report, the Court issued a Scheduling Order that, in relevant part, set a discovery teleconference in September 2021 and made the discovery deadline October 20, 2021.  (*See* Dkt. 20.)

The Court held the teleconference on September 13, 2021.  Based on the matters discussed, the Court amended its Scheduling Order and extended the discovery deadline six months to April 20, 2022.  (*See* Dkt. 33.)  Thereafter, the parties jointly requested a discovery deadline extension three additional times, which the Court granted.  (*See* Dkt. 36, 39, 44.)  Ultimately, the Court issued its Fourth Scheduling Order, setting a final discovery deadline of August 19, 2022. (Dkt. 44.)

In addition to setting the new discovery deadline, the Court referred the parties for a settlement conference.  (Dkt. 42.)  The parties attempted to settle the case on August 17, 2022, but were unsuccessful.  (Dkt. 52.)  The next day, Plaintiff's counsel moved to disqualify the Board's counsel (*see* Dkt. 53), which the Court denied for failure to provide sufficient facts warranting relief (*see* Dkt. 64).

On August 24, 2022—five days after discovery closed—Plaintiff's counsel moved to amend the complaint.  (Dkt. 55.)  The Court denied this motion without prejudice, explaining counsel must provide evidence warranting relief.  (Dkt. 65.)

Plaintiff's counsel filed the renewed motion for leave to amend the complaint on December 7, 2022.  (Dkt. 66.)  In this motion, counsel described newly discovered evidence that was "uncovered" during the deposition process, (*see* Dkt. 66-1 (Mem.) at 1), focusing on depositions of Superintendent Torres-Rodriguez, Bridgette Lee, and Guillermo Garcia.  With respect to Superintendent Torres-Rodriguez, counsel described her as hostile, arrogant and evasive during her deposition, largely because she testified that she did not remember information counsel believed she should have remembered.  (*Id.* at 6.)  As for Ms. Lee and Mr. Garcia, counsel claimed that in February 2022 Mr. Garcia identified Ms. Lee for the first time and that her subsequent deposition in April 2022 revealed "strikingly similar" harassment and abuse as Ms. Laiscell's, "perpetuated by the same actors, with the blessing and assistance of the *Board* and its executives…."  (*Id.* at 9.)  Counsel also stated that some discovery remained outstanding, despite the fact that discovery was closed.  (This Court permitted Plaintiff to file a motion to compel, but plaintiff's counsel elected not to do so.  (*See* Dkt. 58 (Order).))

In moving to amend, counsel included the proposed amended complaint, which contained two structural changes.  First, the proposed amended complaint would add Mr. Griffin, Ms. Banks, Superintendent Torres-Rodriguez, and Mr. Dart as defendants.  (Dkt. 67 (Proposed Am. Compl.)  Second, it would add ten counts under 42 U.S.C. §§ 1981, 1983, 1985 and 1986, as well as common law torts.  While

several of the new counts are difficult to decipher and appear to be multiple counts within a count, in relevant part, plaintiff's counsel sought to add claims that she was subjected to a hostile work environment and that the audit and termination constituted discrimination on the basis of her race, color and sex.  (*Id.*)

The Court denied the motion for leave to amend on December 23, 2022 for failure to show good cause under Federal Rule of Civil Procedure 15.  (Dkt. 69 (citing Second Circuit precedent establishing that a court may deny leave to amend after a scheduling order deadline when the movant fails to establish good cause).)  Specifically, the Court stated that the submitted deposition excerpts did not warrant adding new claims or parties.  (*Id.* at 6.)  The Court also concluded that the evidence did not warrant reopening discovery, as counsel lacked diligence in failing to move to compel discovery while the discovery period was open.  (*Id.* at 7.)  Plaintiff's counsel moved for the Court's reconsideration, which was denied.  (Dkt. 76.)

After denying reconsideration, the Court issued the final Scheduling Order.  (Dkt. 77.)  The dispositive motion deadline was set for March 3, 2023, and the parties thereafter timely filed their summary judgment briefing.

## II.    LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no genuine factual disputes exist.  *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court

is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id*. (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).  Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed—such as where the evidence offered consists of conclusory assertions without further support in the record—summary judgment may lie. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

III.   DISCUSSION

Courts analyze employment discrimination claims with the "now-familiar burden-shifting framework established by the Supreme Court in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Kovaco v. Rockbestos-Suprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016).  While it is the Court's duty to "ensure that employers do not act in a discriminatory fashion, [it does] not sit as a super-personnel department that reexamines an entity's business decisions."  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014).

The *McDonnell Douglas* framework has three steps.  First, it requires the plaintiff to establish a *prima facie* case of discrimination, *see McDonnell Douglas*, 411 U.S. at 802, of which the elements vary for each type of claim.  The Second Circuit has noted that the burden to establish a *prima facie* case is "minimal" or "de minimis."  *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).

Second, if the plaintiff can establish a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action.  *See McDonnell Douglas*, 411 U.S. at 802.  The defendant need only proffer, not prove, the existence of a nondiscriminatory reason for its employment decision.  *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981).  "This burden is one of production, not persuasion; it can involve no credibility assessment."  *Reeves*, 530 U.S. at 142 (internal quotations omitted).

Third, if the defendant meets its burden of production, the burden shifts back to the plaintiff to show that the legitimate, nondiscriminatory reason offered by the defendant is mere pretext for illegal employment discrimination.  *See McDonnell Douglas*, 411 U.S. at 804.  "Although the intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of

fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

### A.    Failure to Promote

Laiscell claims that Defendant failed to promote her because she is a Black woman. (*See* Dkt. 1 ¶ 74 (alleging discriminatory failure to promote on the basis of race, color, sex).) While her claim—commonly known as a "gender plus" claim— is rooted in the intersectionality of her sex and race identities, it is functionally equivalent to a Title VII based on one protected category. The Second Circuit explained why in *Back v. Hastings on Hudson Union Free School District*: "The term 'sex plus' or 'gender plus' is simply a heuristic. It is, in other words, a judicial convenience developed in the context of Title VII to affirm that plaintiffs can, under certain circumstances, survive summary judgment even when not all members of a disfavored class are discriminated against . . . ." 365 F.3d 107, 118–19 (2d Cir. 2004); *see also Murray v. Town of Stratford*, 996 F. Supp. 2d 90 (D. Conn. 2014) (applying "gender plus" principle to a "gender plus race" Title VII claim). The central question, therefore, is whether Defendant's failure to promote Ms. Laiscell was based on any one of her protected classes: race, color or gender.

The Board argues that Ms. Laiscell has not established a triable issue of fact as to her failure to promote claim for three reasons. First, Ms. Laiscell cannot point to evidence establishing the discriminatory intent element of her *prima facie* case. (*See* Dkt. 82-1 (Mem. Mot. Summ. J.) at 9–13.) The Board presents evidence that it used a standardized hiring process, Ms. Laiscell had been promoted through this same hiring process, the interview panel was diverse, Ms. Laiscell personally knew

each interviewer and did not have any concerns about them, the seven final candidates were diverse and Ms. Laiscell was one of them, and Ms. Laiscell ranked third out of the seven finalists.  (*Id.*)  Second, the Board had a legitimate, non-discriminatory reason for hiring Mr. Fleig—a White man—over Ms. Laiscell: he received the highest score in the objective interview process.  (*See id.* at 13–14.)  Third, Ms. Laiscell cannot present evidence that the legitimate, non-discriminatory reason for hiring Mr. Fleig was pretextual.  (*See id.* at 14–17.)

Ms. Laiscell does not address the *McDonnell Douglas* factors or present any legal argument supporting her position.  In fact, she hardly mentions her failure to promote claim at all.  In the Statement of Facts, Ms. Laiscell merely points to evidence that she had never been disciplined; previously received multiple promotions; and that former CFO Ms. Altieri and Executive Director of Elementary and Middle Grades Education Dr. Sandra Inga recommended her for the promotion.  (*See* Dkt. 88 (Pl.'s Opp'n) at 4.)

At the first *McDonnell Douglas* step, Ms. Laiscell bears the burden to establish the *prima facie* elements: "(1) that [s]he belonged to a protected class; (2) that [s]he was qualified for the position [s]he held; (3) that [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004); *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 151 (2d Cir. 2012) (citing *Feingold* standard in failure to promote claim).  Defendant concedes all elements but the fourth.

17

It is undisputed that Defendant hired a White male for the CFO position. Evidence that the employer promoted a person outside the plaintiff's protected class is sufficient to satisfy the discriminatory intent element at the *prima facie* stage.  *See Johnson v. Connecticut*, 798 F. Supp. 2d 379, 387 (D. Conn. 2011) (collecting cases) ("Evidence that a person outside of Plaintiff's protected class was offered the desired position is sufficient for a jury to infer a discriminatory motive"); *Rapp v. Esper*, No. 3:20-cv-272 (KAD), 2023 WL 2666673, at *5 (D. Conn. Mar. 28, 2023) (stating the plaintiff, a Black woman, "easily meets her burden of establishing a *prima facie* case" where "she was rejected for the position, and the position went to … a Caucasian woman").  Accordingly, the Court finds Ms. Laiscell satisfies her burden at the *prima facie* stage.

As for the second step, the Board has the burden to produce evidence that its reason for taking the adverse action is a legitimate, non-discriminatory reason. It is well-established that an employer "is entitled to arrive at a subjective evaluation of a candidate's suitability for a position."  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 106 (2d Cir. 2001), *superseded in part on other grounds by* Fed. R. Civ. P. 37(e).  The employer may not, however, base its promotion decision "solely on wholly subjective and unarticulated standards."  *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 381 (2d Cir. 2003).

The Board utilized its standardized hiring process, which included seven standardized questions and, for each question, gave each of the seven interviewers the opportunity to score the candidate on a scale of one through four.  (*See* Dkt. 1 ¶¶ 10, 12; Dkt. 15 ¶¶ 10, 12; Dkt. 87 ¶¶ 13, 15–17, 22.)  Ms. Laiscell had been

promoted through this process and had also served as an interviewer.  (*See* Dkt. 87 ¶¶ 10, 23–24.)  For the CFO position, the interviewers ranked seven candidates and Mr. Fleig received the highest score.  The Board's decision to award the CFO position to the candidate with the highest score is a legitimate, non-discriminatory reason not to hire Ms. Laiscell.

With respect to the third step, Ms. Laiscell must present evidence that shows the Board's proffered legitimate, non-discriminatory reason is pretextual.  She argues that she was the superior candidate because she had never been disciplined, received exemplary performance reviews, had been promoted in the past, and was recommended for the position by the former-CFO and the Executive Director of Elementary and Middle Grades Education.  (Dkt. 88 at 4.)

Ms. Laiscell's long history of strong performance and recommendations, especially from the prior CFO, are certainly attributes making her a highly competitive candidate.  After all, she ranked third out of seven of the final candidates, and presumably many others applied.  However, her strength as a candidate does not entitle her to the job.  "Where a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, the plaintiff's credentials must be 'so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Haughton v. Town of Cromwell*, No. 3:19-cv-00359 (MPS), 2021 WL 4248858, at *7 (D. Conn. Sept. 17, 2021) (quoting *Byrnie*, 243 F.3d at 103).  Here, Ms. Laiscell's qualifications were not "so superior."  Mr. Fleig had experience

outside of the Board and was skilled in forecasting, both which were assets that Superintendent Torres-Rodriguez wanted from her CFO.  (*See* Dkt. 83-4 at Decl. ¶¶ 6–7.)

Ms. Laiscell does not dispute that Mr. Fleig received the highest score. Courts within our district have observed that "[r]elying on subjective criteria is especially permissible where an employee is being considered for a supervisory position." *Rapp*, 2023 WL 2666673, at \*5 (collecting cases); *c.f. Cipriano v. Forest Pharm., Inc*., No. 3:16-CV-01641 (JCH), 2018 WL 11078642, at \*7 (D. Conn. Sept. 4, 2018) ("Generally, an employee may not create an issue of fact supporting a finding of pretext by questioning an employer's assessment of her job performance."). "Where an employer's explanation, offered in clear and specific terms, 'is reasonably attributable to an honest even though partially subjective evaluation of … qualifications, no inference of discrimination can be drawn.'" *Byrnie*, 243 F.3d at 105 (quoting *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir.1980)).  The interviewers' notes and scores provide a "clear and specific" explanation as to why Mr. Fleig received a higher score.  Accordingly, no reasonable jury would conclude the Board's reason was pretext for discrimination.

The Court also notes that Mr. Griffin's alleged discriminatory animus, as described in Ms. Lee's declaration, does not support her failure to promote claim. Mr. Griffin was not a decision-maker in the promotion process; in fact, Ms. Laiscell supervised him when she temporarily assumed some of the CFO job duties.  (*See* Dkt. 83-7 at Ex. A, 2.)  The only way his animus could be attributable to an adverse employment decision would be under a "cat's paw" liability theory.  *See Vasquez*

20

*v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 274 (2d Cir. 2016) (stating a plaintiff can recover if the employer was negligent in allowing a subordinate's "false allegations, and the retaliatory intent behind them, to achieve their desired end"). But this theory would be unavailing, because the Board hired an independent forensic accounting firm to investigate Ms. Laiscell.  No reasonable juror would believe that the Board's decision not to promote Ms. Laiscell was pretextual while there was an open investigation into her alleged wrongdoing <u>and</u> she failed to score the highest on a standard promotion process through which she had received promotions in the past.  *See id.* ("[A]n employer who, non-negligently and in good faith, relies on a false and malign report of an employee who acted out of unlawful animus cannot, under this 'cat's paw' theory, be held accountable for or said to have been 'motivated' by the employee's animus.").  Even if Ms. Laiscell had filed the necessary paperwork to remove her ex-husband from her health insurance plan and the paperwork was not acted upon, her failure to realize her withholding and coverage had not changed for a number of years reflects inattention to her personal financial affairs, validating the panel's opinion that she was not the best candidate.  Put another way, whether the Board placed her on leave, the record does not support a finding that she was the most qualified candidate at the time when they made the promotion decision for three reasons: (1) Ms. Laiscell did not receive the highest score, (2) Mr. Fleig had experience she did not have, and (3) she demonstrated inattentiveness to financial details, a skillset that is critical to a person holding the position of CFO.  For these reasons, summary judgment is GRANTED as to Ms. Laiscell's failure to promote claim.

B.    <u>Termination</u>

In the Complaint, Ms. Laiscell claims the Board unlawfully terminated her in retaliation for filing a CHRO complaint.   Title VII prohibits an employer from discriminating against any individual for filing a charge or complaint.  *See* 42 U.S.C. § 2000e 3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing[.]")

Defendant raises three reasons why summary judgment should be granted as to the retaliation claim.  First, there is no causal connection between the filing of Laiscell's CHRO complaint and her termination because the investigation and disciplinary process were "well underway" when she filed her CHRO complaint. (*See* Dkt. 82-1 at 18–19.)  Second, the Board had a legitimate, non-discriminatory reason for terminating her: fraudulent and unprofessional conduct, including improperly keeping her ex-husband on her health insurance for nearly four years after they divorced, failing to cooperate with the FAS investigation, and failing to save budget files on the shared drive.  Third, Ms. Laiscell cannot establish pretext simply from temporal proximity and her denial of wrongdoing.

Ms. Laiscell's opposition is confusing.  This is in large part because she spends a significant portion of her brief arguing that her termination constituted discrimination on the basis of her race, color and gender.  (*See* Dkt. 88 at 17–22.) Ms. Laiscell hardly mentions her CHRO complaint at all, and instead focuses on her belief that Mr. Griffin targeted her when he conducted the audit because she is

a Black woman.  (*See* Dkt. 88 at 19.)  Ms. Laiscell argues that Mr. Griffin knew her ex-husband was still on the plan, launched an investigation solely against her, and created a hostile work environment against Black people and women.   (*Id.*) According to Ms. Laiscell, the Board and human resources knew people complained about Mr. Griffin, but they did nothing.  (*Id.* at 19–20.)  But Ms. Laiscell did not bring a discriminatory termination claim, and in any event Mr. Griffin had left the Board's employ before she was terminated.  (*See* Dkt. 1 ¶¶ 73–75 (asserting discriminatory failure to promote and retaliatory termination claims); Dkt. 87-19 at 12:3–12.)

In the four pages focused on her retaliation claim, Ms. Laiscell contends that no other individual was terminated for Defendant's proffered reasons, i.e., improperly leaving a non-family member on the employee health benefits plan, altering an e-mail, and acting unprofessionally.  (Dkt. 88 at 24.)

To establish a *prima facie* claim of retaliation, a plaintiff must show that "(1) she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  The Board only challenges the fourth element.

It is well-settled that "[c]lose temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity

and retaliatory action."  *Id.*  Because the Board terminated Ms. Laiscell only 2.5 months after she filed her CHRO complaint, the Court finds that she has satisfied her *prima facie* case.  *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (explaining five months is "not too long to find the causal relationship"); *MacDuff v. Simon Mgmt. Assocs. II, LLC*, No. 3:20CV773 (RAR), 2022 WL 972426, at *11 (D. Conn. Mar. 31, 2022) (finding causal connection established where plaintiff was terminated approximately three months after protected activity); *Dawson v. Security Servs., of Connecticut Inc.*, No. 3:20-CV-01310 (SVN), 2022 WL 17477601, at *10 (D. Conn. Dec. 6, 2022) (finding that two months between protected activity and termination "is enough to establish there was a causal relationship for purposes of satisfying her prima facie case").

With respect to the second *McDonnell Douglas* step, the Court finds the Board has established a legitimate, non-discriminatory reason for terminating Ms. Laiscell.  That is, the basis for terminating Ms. Laiscell was for "unacceptable and wholly unprofessional" conduct to wit: violating the healthcare insurance plan, editing another person's e-mail without consent and distributing it under their name without permission, and improperly saving budget documents.  (Dkt. 83-4 at Ex. A).  Unprofessional behavior, violating company rules, and fraud—categories under which the Board contends Ms. Laiscell's conduct falls—are all legitimate, non-discriminatory reasons for terminating an employee. *See, e.g., Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 169 (2d Cir. 2001) (work-based disability fraud); *Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 335 (S.D.N.Y. 2020) (unprofessional behavior and violation of employer's policy); *Moore v. NSTAR*

*Elec. & Gas Co.*, 320 F. Supp. 3d 261, 268–69 (D. Mass. 2018) (violation of employer's benefits plan); *LeBlanc v. United Parcel Serv.*, No. 11 Civ. 6983(KPF), 2014 WL 1407706, at *14–15 (violation of employer's integrity policy); *Asiedu v. Broadreach Med. Res.*, 19 Civ. 11825 (ER), 2022 WL 4237077, at *17 (S.D.N.Y. Sept. 13, 2022) (dishonesty); *Campbell v. Nat'l Fuel Gas Dist. Corp.*, No. 13-CV-00438-W(F), 2016 WL 89629078, at *9 (W.D.N.Y. July 26, 2017) (violation of workplace rules and lying).  While the Board did not submit any company policies for the Court's consideration, ample precedent about sufficiently similar conduct supports a finding that the Board had legitimate, non-discriminatory reasons for termination.

Ms. Laiscell claims that the proffered reasons for termination are pretextual. First, she argues no other employee had been terminated for failing to take an ineligible dependent off the healthcare plan.  (Dkt. 88 at 24.)  Second, she argues people routinely changed other people's e-mails.  (*Id.*)  Third, she argues there is no evidence that she acted unprofessionally when she stored her files on her laptop.  (*Id.*)

While the Board described the reason for termination as "unprofessional conduct"—citing multiple examples of such conduct—the Court will assess each example.  The Court starts with Ms. Laiscell's failure to remove her husband from her health benefits plan.  Ms. Laiscell occupied a leadership position in the financial department, which placed her in a unique position of trust accompanied by an expectation she would follow proper financial procedures.  She posits that she overpaid her premiums as a result of her ex-husband improperly remaining on her healthcare plan, (*see* Dkt. 88 at 30)—implying that she did not profit from the error—

but as a professional skilled in financial management, Ms. Laiscell knew or should have known that her health insurance coverage and premium, as reflected on her paystub or deposit notice, did not change in the years after her divorce.   As Superintendent Torres-Rodriguez remarked in the termination letter, it "is particularly egregious given [her] stature and position held in the District as the Executive Director of Financial Management," including the fact she "received and [was] aware of very specific information related to the dependent audit."  (Dkt. 83-4 at Ex. A.)  Indeed, it is undisputed that every other employee who improperly kept an ineligible dependent on the employee health benefit plan held a lower-level position than Ms. Laiscell.  (*See* Dkt. 87 ¶ 72.)  Considering the fact the audit was not intended to be punitive and in light of the reasoning proffered in the termination letter, (Dkt. 87-19 at 100:12–20), a reasonable jury would conclude it was precisely Ms. Laiscell's position in leadership that made her conduct worthy of termination.

It may very well be that Ms. Laiscell submitted the proper paperwork to remove her ex-husband from her health insurance.  Assuming this fact is true, Ms. Laiscell still fails to show pretext.   "An employer's good-faith belief that an employee has committed misconduct provides the employer with a nondiscriminatory reason for termination, whether or not the misconduct occurred."   *Honeck v. Nicolock Paving Stones of New England, LLC*, No. 3:04cv1577 (JBA), 2006 WL 2474950, at *7 (D. Conn. Aug. 25, 2006) (citing *Roge*, 257 F.3d at 169).  Ms. Laiscell has not submitted evidence that shows the Board knew she submitted the paperwork to Ms. Bonfiglio or that the financial loss was the fault of someone who was not Ms. Laiscell.  The mere fact that she filed a CHRO

complaint did not insulate her from termination. *Craddock v. Little Flower Children & Family Servs. of New* York, No. 12-CV-5062(JS)(GRB), 2016 WL 755631, at *13 (E.D.N.Y. Feb. 25, 2016) (explaining that filing a complaint "does not insulate an employee from subsequent discipline or discharge" nor does it create a presumption of retaliation; rather, plaintiff must show a nexus between the grievance and the adverse action).  Absent evidence showing the Board did <u>not</u> have a good faith belief she committed misconduct, Ms. Laiscell fails to show the Board's decision was pretextual.

With respect to improperly saving budget files on her laptop's hard drive, the Court finds that Ms. Laiscell similarly fails to show pretext.  Ms. Laiscell was responsible for $284 million in general funds, approximately $130 million in annual grant funds, and $80 million in risk-related funds such as worker's compensation and pensions.  (Dkt. 83-3 (Def.'s Mot. Summ. J. Ex. 2, Laiscell Depo.) at 50:1–19.) Given Ms. Laiscell's duties of developing and maintaining the Board's budget as well as overseeing the District's finances, (Dkt. 87 ¶ 4), the budget documents were critically important and her failure to save them on the shared drive could have been catastrophic if her laptop was lost or destroyed.  This is especially problematic since the Board is subject to Freedom of Information Act requirements.  *See* Conn. Gen. Stat. §1-200(1)(A).  In her Local Rule 56(a)(2)(ii) Statement, Ms. Laiscell claims that her laptop was issued by the Board, which was backed-up to the District's cloud automatically. (*See* Dkt. 87-26 ¶ 48.)  The evidence she cites indicates that the District uses Microsoft OneDrive to automatically backup laptops. (*See* Dkt. 87-13 at 126:4–12; Dkt. 89-1 ¶ 19.)  However, an individual

could save a document locally (and not on the OneDrive) if she is not logged in to her OneDrive account or otherwise dismantles the syncing function.  Ms. Laiscell has not provided evidence that the documents discovered during the investigation were actually properly uploaded on the OneDrive.  A fair reading of the evidence is that Ms. Laiscell maintained some financial records on her laptop's local hard drive as opposed to the Board's shared OneDrive, that some documents were not automatically uploaded onto the OneDrive, and that the laptop's local version  was the only financial record of that type.  If the Board had not investigated Ms. Laiscell, she could have deprived the agency of its access to finances and of its ability to be accountable for its  financial management.[2]  The fact that Ms. Laiscell did not appear to have lost any critical data does not negate the fact that the Board believed she failed to follow protocol for handling and securing critical public records.  (*See* Dkt. 83-4 at Ex. 5 ¶ 19; Dkt. 83-7 at Ex. 6 ¶¶ 9–10; Dkt. 87-13 at 125:17–126:12 (explaining documents must be saved on the District's OneDrive).)

The Court expresses no opinion about the altered e-mail issue.  At the time, Ms. Laiscell was Mr. Griffin's interim supervisor and presumably would have had authority to revise his work product.  (*See* Dkt. 87-2 at Ex. A, Laiscell-000039;  Dkt. 89-2 ¶ 9.)  Neither party submitted any policies that were purportedly violated.  The record shows that Ms. Laiscell was transparent insofar as she informed Mr. Griffin

---

[2] In her declaration, Ms. Laiscell also stated her "budget files were backed up and protected on the City of Hartford MUNIS financial system."  (Dkt. 89-1 ¶ 19.)  MUNIS' function is unclear, but it is improbable that Ms. Laiscell would have saved all of her documents on a city-wide system that extended beyond her employer.  Furthermore, as with the OneDrive, Ms. Laiscell did not provide evidence that the documents at issue were saved on MUNIS. Even if she had presented such evidence, the termination was based on other grounds as well.

she deleted the sentence at issue, adding, "I hope that's not concerning to you." (Dkt. 83-6 at Ex. E.)  Presumably, Ms. Laiscell would have rectified the deletion if Mr. Griffin was concerned.  However, this does not negate the fact that Ms. Laiscell altered Mr. Griffin's e-mail, sent it to the Superintendent and Deputy Superintendent without notifying them she altered his e-mail, and did so without his consent.  While Ms. Laiscell claims that Mr. Griffin altered the e-mails of his own subordinates, (Dkt. 87-26 (Pl.'s 56(a)(2)(ii) Stmt.) ¶ 23), the evidence she cites merely supports a finding that Mr. Griffin was upset she edited his e-mail.  (*See* Dkt. 87-16 at 31,35 (Vasquez-Matos stating, "[W]ithout the permission of the author of the email, I would not correct it without their permission or ask them to correct it."); Dkt. 87-17 (Pl.'s Tr. Lee Depo.) at 81 (Lee stating Mr. Griffin and Ms. Laiscell worked on the e-mail together and that Griffin "got really mad that she edited it, which she had all the right to do"); Dkt. 89-2 ¶ 23 (Lee stating "it was well-known Griffin had racist and sexist attitudes and beliefs").)  The record therefore indicates the Board believed in good faith that Ms. Laiscell committed misconduct.  *See Honeck*, 2006 WL 2474950, at *7.

Ultimately, the only evidence linking Ms. Laiscell's termination to the filing of her CHRO complaint is temporal proximity.  When a defendant provides a legitimate, non-discriminatory reason for terminating a plaintiff, temporal proximity alone cannot establish pretext.  *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010).  Although questions could be raised as to the strength of the Board's three reasons for termination, the Court is not the Board's "super-personnel department."  *Delaney*, 766 F.3d at 169.  Accordingly, it must defer to the rational

decision of the employer absent evidence of discrimination by or through the decision maker and may not "reexamine[ the Board's] business decisions." *Id.* For these reasons, the Court finds that no reasonable jury could conclude Ms. Laiscell's CHRO complaint was a but-for cause of her termination. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

The Court also notes that Mr. Griffin's apparent discriminatory animus (as described in Ms. Lee's declaration) is not evidence of pretext in this retaliation claim. She posits that Mr. Griffin, her peer and later subordinate, was racist and sexist and sought to get her fired. Even if all of this was true, Mr. Griffin resigned before the independent investigation into Ms. Laiscell's conduct concluded and two months before she was terminated. His memorandum did not include racist, colorist or sexist remarks. There is no evidence to support a finding that he played a pivotal role in the termination decision—on the contrary, the record is replete with evidence that the actual decision makers reached an independent decision. His bias is therefore not causally connected to the investigation results or her eventual termination. It is for this reason that a discriminatory treatment claim— which Ms. Laiscell did not bring but discusses at length in her briefing—would similarly be unavailing based on the record in this case.[3]

    **C.**    <u>Evidentiary Rulings</u>

Ms. Laiscell objected to the declarations from Superintendent Torres-Rodriguez, Ms. Banks, and Mr. Griffin on the grounds that they conflicted with prior

---

[3] For these same reasons, leave to amend—which Plaintiff requested in December 2022 but was denied—would have been futile. *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990) (stating leave to amend should not be granted if amendment would, in relevant part, be futile).

deposition testimony.   (*See* Dkt. 88 at 9–16.)   The Court has compared the declarations with the depositions and finds they do not contradict each other.   Rather, the declarations provide information that are on similar topics—like, for example, the hiring process, the audit, or the investigation—but is about a slightly different aspect of the topic.   In any event, the Court carefully assessed the evidence and only cited to declarations once it concluded the evidence did not contradict the record.

## IV.    CONCLUSION

For the above reasons, the Court GRANTS summary judgment in favor of the Board.  The Clerk is directed to close this case.

IT IS SO ORDERED

_____

Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: September 22, 2023